## IN RE RODGERS' ESTATE.

### (No. 5,234.)

#### (Submitted May 26, 1923. Decided June 25, 1923.)

#### [217 Pac. 678.]

*Executors and Administrators—Trust Funds—Improper Use —Liability for Interest—Claims Against Estate—Presentation—Time.*

Executors and Administrators—Use of Trust Funds—Liability for Interest.

1. An executor who held trust funds of the decedent in his possession at the time he qualified as such at once became liable therefor as for money in his hands, under section 10133, Revised Codes of 1921, with interest thereon from the death of decedent, and by thereafter continuing to mingle the funds, as he had done theretofore, with his own moneys and using it in connection with his business until it was lost, he was bound to account for it with interest.

Same—Claims of Executor Against Estate—Time for Presentation.

2. A claim of an executor against the estate in his charge must be presented for allowance within the same time as the claims of other creditors, and if not so presented is barred under the provisions of section 10173, Revised Codes of 1921.

Same—Claims Against Estate—Improper Allowance.

3. *Held,* under the above rule (par. 2) that where an executor neither in the inventory and appraisement nor in his accounts prior to final settlement of the estate had mentioned an alleged indebtedness of decedent to him for taking care of his cattle and paying taxes thereon, and his claim for reimbursement was not made until long after the time for presenting claims had expired and not until his final account was ordered reopened at the instance of the heirs, it was error to allow such items as an offset against the amount for which he was accountable.

*Appeal from District Court, Prairie County; Stanley E. Felt, Judge.*

FROM A DECREE settling the final account of E. W. Thomas, executor of the estate of Patrick Rodgers, deceased, William Rodgers and wife appeal. Modified and affirmed.

*Mr. P. F. Leonard,* for Appellant, submitted a brief and argued the cause orally.

The trial court adopted the novel theory that an executor could use the trust funds for himself and for his own busi-

ness if it was not shown he made a profit on the investment. Thomas violated the provisions of sections 7888 and 7889, Revised Codes of 1921, and should be required to pay interest. The following authorities approved by or in line with *In re Eakins' Estate* (Mont.), 208 Pac. 956, foreclose all argument on the question of interest: *In re Allard's Guardianship,* 49 Mont. 219, 141 Pac. 661; *In re Harteman's Estate,* 73 Cal. 545, 15 Pac. 121; *In re Sanderson's Estate,* 74 Cal. 199, 15 Pac. 753; *In re Hilliard's Estate,* 83 Cal. 423, 23 Pac. 393; *Estate of Merrifield,* 66 Cal. 180, 4 Pac. 1176; *In re Stott,* 52 Cal. 403; *Estate of Clark,* 53 Cal. 355; *Miller* v. *Lux,* 100 Cal. 615, 35 Pac. 345; *In re McPhee's Estate,* 156 Cal. 335, Ann. Cas. 1913E, 899, 104 Pac. 455; *Estate of Clary,* 112 Cal. 293, 44 Pac. 569; *Gassell* v. *Gassell,* 147 Cal. 513, 82 Pac. 42; *In re Cousins' Estate,* 111 Cal. 445, 44 Pac. 182; *In re Piercy's Estate,* 168 Cal. 755, 145 Pac. 91; and see, also, authorities cited in 24 C. J. 77.

The executor's claim: The law provides when, how, where and to whom the claim must be presented. *Ita lex scripta est.* The court cannot change or repeal the law. The claim as presented by Thomas clearly sounds in contract, otherwise he had no claim whatever. The decision of the trial court would imply that the matter of "allowance or rejection" was an idle and useless ceremony, and the court has annulled altogether the specific provisions of the Probate Code as to publication of notice to creditors and the presentation of duly verified claims to the executor or judge within a limited time and the allowance or rejection of such claims. The court has held that none of these provisions of the Code need be observed at all if the executor happens to be the claimant and at the same time be indebted to the estate. In that event the executor sits as the advocate and judge in allowing or rejecting his own claim. He is limited by neither time, form nor ceremony, and it would be inconvenient to reject his own claim because he would have to sue himself. The decision stands alone, without precedent or authority to support it. Identical statutes have been construed in *Hildebrandt's Es-*

*tate,* 92 Cal. 413, 28 Pac. 486, and *In re Long's Estate,* 9 Cal. App. 754, 100 Pac. 892, against the holding of the trial court. These cases simply announce the general rule applicable under similar statutory provisions.    (24 C. J. 331, 338.)

The legal effect of the judgment in this case was to permit the executor to counterclaim or offset his alleged claim against the moneys due the estate without presentation to the judge within the time limited by law.    That is contrary to law. (*Reveal* v. *Stell,* 56 Cal. App. 463, 205 Pac. 875.)

*Mr. Thomas M. Murn,* for Respondent, submitted a brief and argued the cause orally.

The appellants contend that by reason of this statute the executor immediately came into possession of so much cash which he intermingled with his own cash and misappropriated and used.    That this theory is not the law was held in the case of *Culbreth* v. *Smith,* 124 N. C. 289, 32 S. E. 714, which held that an executor's failure to pay a note executed by himself in favor of the testator is not a fraudulent misapplication of funds of the estate.

In the case of *In re Davis' Estate,* 35 Mont. 273, 88 Pac. 957, the court stated the rule as laid down by the supreme court of Massachusetts which said: ''The general rule is that an executor or administrator (except where he is charged with a special trust, to invest money on interest) is not chargeable with interest, unless he has actually received interest, or else where from culpable delay in settling his accounts, it may be fairly inferred that he has made a profit of the funds in his hands.''    (See, also, *Chase* v. *Lockerman,* 11 Gill & J. (Md.) 185, 35 Am. Dec. 277.)

Nowhere is the executor here charged with having received interest from the money, and the delay of settling of the accounts cannot be classed as culpable delay, from which could be fairly inferred he made a profit from the money.    As to the question of culpable delay we would hardly say that under the circumstances a delay of three years in settling this estate was extraordinary.    Mr. Thomas stated the reason he

[68 Mont. 46.]

did not pay the money into the estate was because he did not have it with which to pay. There can be no question but what his delay, whether culpable or not, was simply for the purpose of collecting in and earning sufficient money with which to pay the purchase price of the cattle.

In 23 Corpus Juris, 1206, the law relating to interest provides that the executor is chargeable for what he actually collects. Otherwise it is not usual to charge with interest unless he received it or some misconduct or gross delinquency is shown against him. (*Taylor* v. *Banham*, 5 How. (U. S.) 233, 12 L. Ed. 130 [see, also, Rose's U. S. Notes]; *Sherrell* v. *Shepard*, 19 Fla. 300; *Stafford* v. *McIntosh*, 39 La. Ann. 836, 2 South. 596; *Banks* v. *Machen*, 40 Miss. 256; *Craig* v. *Manning*, 8 N. J. Eq. 806; *Shultz* v. *Pulver*, 11 Wend. (N. Y.) 361; *Torbett* v. *McReynolds*, 4 Humph. 215; *Chapman* v. *Shephard*, 24 Gratt. (Va.) 377.) In view of all the circumstances herein it seems to us that Mr. Thomas, if he has been negligent and slow, was in fact not guilty of such culpable negligence or delay that it should act as a penalty.

As to the executor's claim: The executor is no more estopped from allowing himself credit for the items in question than he would be to show himself entitled to a credit for a cash payment made toward the purchase price of the cattle, which was admitted through inadvertence. His right in this respect is clearly established in the case of *In re Cunningham*, 1 Hun (N. Y.), 214, which held that an executor who is found to be indebted to the estate should be allowed to set off against such debts an indebtedness to him from the testator. In 24 Corpus Juris, 441, relating to setoffs and counterclaims, we find: "An executor or administrator indebted to the estate of his decedent will not be allowed to pay in full a claim that he holds against the estate, but will be required to offset the debt against his claim." The following cases are cited therein: *Whipple* v. *Crocker*, 6 Ill. App. 133; *Pool* v. *Ellis*, 64 Miss. 555, 1 South. 725; *Terhune* v. *Oldis*, 44 N. J. Eq. 146, 14 Atl. 638.

MR. JUSTICE STARK delivered the opinion of the court.

For a number of years prior to September 18, 1917, Patrick Rodgers was a resident of Prairie county, and at least a portion of the time was employed by one E. W. Thomas, who was extensively engaged in the cattle business in Eastern Montana. Rodgers appears to have been thrifty, for he had accumulated some sixty head of cattle, which were run with the Thomas herds.

On the date above mentioned, Rodgers entered the military service of the United States by voluntary enlistment, and on the same day made a will in which he left all of his property to his aged father and mother, who lived in Ireland, and named Thomas as his executor. Thereafter he went overseas with the American Expeditionary Forces, and on June 22, 1918, died in France as the result of wounds received in action. Upon his enlistment he left his cattle in the keeping of Thomas, who agreed to look after them. Thomas ran the cattle with his own during the winter of 1917–18, and in the early summer of the latter year, pursuant to a letter which he received from Rodgers, purchased them and allowed the sum of $65 per head therefor.

It is fairly inferable from the record that Rodgers had directed Thomas to place the selling price of the cattle on deposit to his credit in the Miles City National Bank of Miles City. However, Thomas did not do this, but kept the cattle as his own, and retained the selling price without segregating it from his own funds, and used it in connection with his business.

On December 4, 1918, Thomas filed a petition for the probate of the Rodgers will, and such proceedings were had thereunder that on July 17, 1919, the will was admitted to probate and Thomas appointed the executor thereof. Thomas immediately qualified by taking the necessary oath and filing a bond as required by the order of the court, and on or about July 17, 1919, paid all the debts of the deceased, together with the expenses of administration. Shortly thereafter, by au-

thority of the court, he sent to the legatees named in the will the sum of $490; the total expenditures thus made amounting to $1,438.20. On July 25, 1919, notice to creditors was duly published to present their claims to the executor within four months from that date.

In the petition for probate of the will the property of the estate is described and valued as follows: "Sale price of about 60 head of cattle sold to E. W. Thomas at $65 per head, $3,900; one saddle-horse, $50; one sheep wagon, $50; total, $4,000." On July 17, 1919, appraisers of the estate were appointed, but they did not act, and no inventory and appraisement of the estate were made until new appraisers were appointed by the court on October 8, 1921. These appraisers made their report on the same day of their appointment, showing the property of the estate to consist of "moneys belonging to said deceased which have come into the hands of the executor, $1,438.20; money due the estate from E. W. Thomas, $1,941.80," and containing the further recital that the last-mentioned sum "has never been paid into the funds of the said estate and is a balance due on the purchase price of certain cattle owned by the said deceased which were purchased by the said E. W. Thomas from deceased during his lifetime." On the same day that the inventory and appraisement were returned into court, Thomas rendered and filed his first account, reciting, among other things, that he had received the sum of $1,438.20, all of which had been paid out; also "that at the time of the death of the said deceased, E. W. Thomas was indebted to him in the sum of $3,380, and that there now remains due and owing a balance of $1,941.80, which the said E. W. Thomas has not paid to the said estate."

On November 4, 1921, an order was made allowing and settling the above account, but subsequently, in February, 1922, on the petition of William and Bridget Rodgers, father and mother of the deceased and the legatees named in the will, the account was reopened and the executor ordered to "file a new, full, complete and final accounting of the said estate from the time of his appointment as executor and of the

[68 Mont. 46.]

condition thereof and of all his actions and doings as such executor." Pursuant to this order, on May 1, 1922, Thomas filed a supplemental account showing that the estate was ready to be closed and that the property belonging to the same consisted of the balance of the account which he owed, and also the saddle-horse and sheep wagon above mentioned. In this account he also set up a claim of $364 alleged to be due him from the deceased for running the cattle of the deceased during the winter of 1917–18, and $20.44 for taxes paid on the cattle of deceased in November, 1917, and filed therewith a creditor's claim for that amount. This creditor's claim was not acted upon by the judge, but the amount thereof was subsequently allowed to Thomas, as hereinafter shown. To the allowance of this account the legatees William and Bridget Rodgers filed certain objections by which they sought to have the executor Thomas charged with interest on the purchase price of the cattle from the time he took them over in June, 1918, until the time of his appointment as executor on July 17, 1919, and from the latter date down to the time of distribution, and also to have the court disallow Thomas' claim for running the cattle for the winter of 1917–18, and the amount alleged to have been paid for taxes on the cattle in November, 1917. After a hearing, the court held that Thomas was not liable to the estate for any amount of interest, and allowed the claim for running the cattle and for taxes paid, amounting to $384.44, as an offset against the amount due from him to the estate, thereby reducing the same to $1,557.-36. From the decree settling this account the objectors have appealed to this court, and specify as errors the refusal of the court to require the payment of interest by Thomas and the allowance of his claim of $384.44 as above set out.

The only material facts developed at the hearing, in addition to those above recited, were that at the time of Thomas' appointment as executor in 1918, and for some time subsequent thereto, he was reasonably worth a sum in excess of $150,000, and during that time carried a substantial checking account of $1,000 or $2,000 and was able to borrow from the

bank up to $25,000, but that, by reason of meeting financial reverses during the winter of 1919–20, he had been reduced to practical insolvency; and that the reason why Thomas had not mentioned his claim for taxes and wintering the cattle, and claimed the same as an offset against the price of the cattle when he filed the petition for probate of the will and the other proceedings prior to the final account filed on May 1, 1922, or about three and one-half years after the institution of the probate proceedings, was that he "supposed when the estate was settled up his claim would be allowed, and didn't suppose it was necessary to mention it when he filed the petition for letters, and he didn't know why it had not been mentioned in his first report."

1. The court made a finding to the effect that the number of the Rodgers cattle purchased by Thomas was fifty-two; that [1] the purchase price was $65 per head, making a total of $3,380; and that this amount was due at the time of Rodgers' death, on June 22, 1918. Thomas admitted at the hearing that he never segregated this amount from his own funds, and it was established that he continued to use it in his own business down to the date of his appointment as executor, although he was amply able to have made payment at the time. Under these circumstances we think that on June 22, 1918, Thomas became liable as for money received for the benefit of Rodgers, or his representatives, for the sale price of the cattle, and under the provisions of section 7725, Revised Codes of 1921, was liable for interest thereon at the legal rate of eight per cent per annum from that date until the time of his qualification as executor on July 17, 1919.

When Thomas qualified as executor the sale price of the cattle, with the interest due thereon, as indicated in the foregoing paragraph, was due from him, and he immediately became liable therefor as for money in his hands by section 10133, Revised Codes of 1921.

In paragraph 9 of the objections filed to the final account it is recited that on or about July 17, 1919, Thomas paid all debts of deceased and sent the legatees $490, the total of such

expenditures being $1,438, and those recitals are admitted in the executor's reply thereto, so that this sum should be deducted from the amount of Thomas' liability as executor on July 17, 1919, to determine the exact amount for which he was accountable after that date.

After his appointment as executor Thomas made no change in the method of handling the funds representing the selling price of the cattle. The testimony at the hearing showed that it was never segregated or set apart in a separate fund, but that Thomas continued to use it in connection with his own resources until it was finally lost in his financial reverses. His only explanation for not paying the money into the estate was that he did not think it was necessary for him to do so.

Section 7889, Revised Codes of 1921, declares that "A trustee may not use or deal with the trust property for his own benefit, or for any other purpose unconnected with the trust, in any manner." And by section 7897, if he does use property "contrary to section 7889 may, at the option of the beneficiary, be required to account for all profits so made, or to pay the value of its use, and, if he has disposed thereof, to replace it, with its fruits, or to account for its proceeds, with interest." These sections of the Code are applicable to this case. Thomas, as executor, was liable for the amount which he owed ᵛthe estate as for money in his hands. It was a trust fund. He did not pay it into the estate, but instead of doing so used it for his own benefit, and is therefore bound to account for it with interest. (*In re Eakins' Estate,* 64 Mont. 84, 208 Pac. 956.)

2. With reference to the claim of Thomas for taxes paid in [2, 3] 1917 and for running the cattle for the winter of 1917–18, the learned judge of the trial court made a finding to the effect that it was within the agreement between Rodgers and Thomas that the latter should charge for his services in caring for the cattle and that it had always been his intention so to do; that it was merely an oversight on his part that the charge had not been made prior to the filing of his final account on May 1, 1922; that he was not making a claim against the estate in the ordinary sense, but was merely showing that

he owed the estate less than the first figure he gave upon the subject. For these reasons the amount of the claim was allowed as an offset against the sum for which Thomas was accountable to the estate at the time of his appointment as executor. In this, we think, the court erred. It seems to us that the finding is contrary to the facts appearing in the record. At the time he filed the petition for probating the will he made no mention of this account. When he was appointed executor on July 17, 1919, he paid off all claims against Rodgers and no mention was made of his own claim. In the inventory and appraisement which was made and filed on October 8, 1921, and to which Thomas made affidavit, he was particular to emphasize the fact that he owed the estate $1,941.80, and that it was a debt incurred during the lifetime of Rodgers and had never been paid into the estate. In his first account, which was filed on the same day with the report of the appraisers, he states that at the time of the death of Rodgers he was indebted to him in the sum of $3,380, and "there now remains due and owing a balance of $1,941.80." It was not until after he had been required by the court to render a new, full, and complete account of all his transactions as executor that any mention is made of a pretended claim which he had against the estate on account of taxes and caring for the cattle during the winter of 1917 and 1918.

Conceding, however, that the executor's claim against the Rodgers estate was a just one, still it could not properly be allowed by the court at the time it was made, in May, 1922. This claim arose out of the agreement made with Rodgers that Thomas should be entitled to charge for his services in caring for the cattle, i. e., it was a claim arising upon contract. The time for the presentation of claims against the estate had long since expired when this claim was made. Section 10173, Revised Codes of 1921, provides: "All claims arising upon contracts, whether the same be due, not due, or contingent, must be presented within the time limited in the notice [to creditors], and any claim not so presented is barred forever." And under the provisions of section 10191: "If the executor

\* \* \* is a creditor of the decedent, his claim, duly authenticated by affidavit, must be presented for allowance or rejection to the judge, and its allowance by the judge is sufficient evidence of its correctness, and must be paid as other claims in due course of administration.''

The claim of an executor against an estate must be presented within the same time as the claim of any other creditor, and if not so presented it is barred under the provisions of section 10173. (*In re Hildebrant's Estate,* 92 Cal. 433, 28 Pac. 489; *Morrow* v. *Barker,* 119 Cal. 65, 51 Pac. 12; *In re Long's Estate,* 9 Cal. App. 754, 100 Pac. 892.)

In our opinion the court erred in allowing the amount of this claim to be offset against the sum for which Thomas was accountable to the estate, as well as in failing to hold him liable for interest upon the selling price of the cattle from the time he purchased them until his appointment and qualification as executor, and on the balance remaining in his hands as executor after payment of the sum of $1,438.20 on or about the seventeenth day of July, 1919.

The cause is remanded to the district court of Prairie County, with directions to modify the decree settling the final account in accordance with the views above indicated, and when so modified the decree will stand affirmed.

*Modified and affirmed.*

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES COOPER, HOLLOWAY and GALEN concur.

Rehearing denied July 11, 1923.